CAPE GIRARDEAU-JACKSON INTERURBAN RAILWAY COMPANY et al. v. LIGHT & DEVELOPMENT COMPANY OF ST. LOUIS, Appellant.

Division One, March 28, 1919.

1. **STREET RAILWAY: Franchise to Commercial Railroad: Statute.** Under Section 9250, Revised Statutes 1909, first enacted in 1887, a city of the third class had authority, by ordinance, to grant to any person or corporation the right to construct and operate a standard-guage railroad or a street railway in its streets, and to control and regulate the use thereof. A franchise granted in 1902 to a standard-guage railroad authorizing it to operate an electric railway in the streets, was valid.

2. ———: ———: **General and Special Statutes.** There is no conflict between Sections 9493 and 9494, which are general and apply to all

cities and authorize the incorporation of and the grant of frachises to street railway companies, and Section 9250, enacted at the same session, which is special and an exception to the other two, and applies to only cities of the third class and authorizes them to grant to any person or corporation a franchise "to make and construct railroads and street railroads in any street or highway of the city."

3. **SPECIFIC PERFORMANCE: Useless Performance.** If the undertakings of plaintiff and defendant are joint and contemporaneous, plaintiff's failure to perform after he has been notified, by the words or conduct of defendant, that further performance would be useless, will not prevent a decree for specific performance, if it be shown at the trial that plaintiff is able and willing to perform the balance of the contract.

Appeal from Cape Girardeau Circuit Court.—*Hon. Frank Kelly*, Judge.

AFFIRMED.

*Chas. W. Bates, Nathan Frank, Oscar A. Knehans* and *I. R. Kelso* for appellant.

(1) At the time of the passage of the Lapsley Ordinance (Ordinance 637), as well as at the time of the passage of the ordinance (Ordinance No. 1046) attempting to grant a franchise to the Cape Girardeau-Jackson Interurban Railway Company, the law provided that "the party to which said franchise may be granted shall be an incorporated company, organized under the laws of the State, to construct, maintain and operate a street railroad in the town or city by which such franchises is granted." Sec. 9494, R. S. 1909. (2) Sec. 9250, R. S. 1909, which is a part of the charter of cities of the third class, provides that no railroad or street railroad shall be constructed or operated until all damages to abutting lands shall have been first ascertained and paid to the owners thereof, by the person or corporation constructing said railroad or street 'railroad, and that the city council shall pass suitable ordinances providing the manner and way of ascertaining any damages contemplated by this section.

Sec. 9250, R. S. 1909. The record shows that no steps were ever taken by the city council or by the Street Railway Company to comply with any of the provisions of the statutes relative to the ascertaining and payment of damages to abutting property owners. The above law, passed in 1887, applies to surface roads, as well as railroads operated above or under the street. Sec. 9494, R. S. 1909; Ruckert v. Grand Ave. Ry. Co., 163 Mo. 261; Goddard v. Chicago & N. W. Ry., 66 N. E. 1066; Wilder v. Electric Traction Co., 75 N. E. 194; Allen v. Clausen, 90 N. W. 181. A court will not hesitate to declare franchises void, which have been granted in violation of legislative limitations or restrictions. (3) A court will not decree specific performance of a contract when the agreement is for a good title and all reasonable doubt as to the title is not removed; and though the court may entertain a favorable opinion of the title, yet, if that opinion may be fairly questioned by competent persons, it will not decree specific performance. Hymers v. Branch, 6 Mo. App. 511; Isaacs v. Skrainka, 95 Mo. 524; Dunn v. White, 63 Mo. 182; Veth v. Gierth, 92 Mo. 97; Isaacs v. Skrainka, 95 Mo. 517.

*Jeffries & Corum* and *Oliver & Oliver* for respondents.

(1) The City of Cape Girardeau, being a city of the third class, had the right, power and authority to grant to Lapsley the franchise it gave him and his associates by Ordinance No. 696, in 1902; and it had the right, power and authority to grant to the Cape Girardeau-Jackson Interurban Railway Company the new franchise it gave to it by Ordinance No. 1046, in December, 1913, Laws 1887, p. 84, secs. 107-110; Sec. 1576, R. S. 1889, p. 443; Laws 1893, p. 89, sec. 105; Sec. 5855, R. S. 1899; Sec. 9250, R. S. 1909. (2) There is no conflict between the act relating to cities of the third class, approved March 30, 1887, and the act of the General Assembly relating to franchises granted to elevated

and underground railroads, approved March 26, 1887. Laws 1887, p. 40; Secs. 9493 and 9494, R. S. 1909; Musick v. Railroad, 144 Mo. 309; Dart v. Bagley, 110 Mo. 54; Roth v. Gabhert, 123 Mo. 32; Rosenblatt v. Heman, 70 Mo. 451; Tomb v. Jackson, 69 Mo. 153-4; St. Louis & Meramec River Railroad Co. v. City of Kirkwood, 159 Mo. 239. (3) Specific performance of a contract is based upon the maxim which holds: "Equity regards that as done which ought to have been done," or, phrased in another way: "Equity regards that as already done which was agreed to be done." Burgess v. Wheate, 1 W. B. L. 121; Ensign v. Kellogg, 4 Pick. 5; 22 A. M. & Eng. Ency. Law, pp. 1917-1922. (4) The plaintiff may show that he has performed in part the contract, and that he is ready and willing to perform the balance at the time of trial; or, as in the case at bar, that the defendant, by its conduct, made it useless to tender compliance within the time stated in the contract. If the undertaking on plaintiff's part is a joint and contemporaneous undertaking the failure of the plaintiff to perform after it had been notified that performance was useless will not prevent the court from decreeing specific performance in his favor. 22 A. M. & Eng. Ency. Law, p. 929; Minneapolis R. R. Co. v. Cox, 76 Iowa, 306; Mitchell v. Long, 5 Litt. (Ky.) 71, (5) The respondents, within proper time, have performed the contract on their part as fully as appellants' conduct would permit and at all times have been and still are ready to perform the balance of their contract when permitted to do so by appellants, and equity should compel appellant to specifically carry out its obligation, as damages are wholly inadequate to determine the loss that respondents have and will suffer if appellants are not forced to specifically perform. Price v. Mirgon, 10 Atl. 663; Parris v. Haly, 61 Mo. 453.

WOODSON, J.—This suit was instituted by the plaintiffs in the Circuit Court of Cape Girardeau County against the defendants for the specific performance

of a written contract made by the defendants for the purchase of the stocks, bonds and properties of the Cape Girardeau-Jackson Interurban Railway Company from plaintiffs. The contract will be presently set out in full.

The trial resulted in a decree in favor of the plaintiffs and the defendants duly appealed the cause to this court.

The record is unusually long, covering about 760 pages of printed matter; since, however, the facts are practically undisputed; we will be saved the labor of wading through this great volume of evidence, except regarding some few details.

The facts were substantially as follows:

. The plaintiffs, on and prior to February 17, 1913, were the owners of all of the stocks, bonds and properties of the Cape Girardeau-Jackson Interurban Railway Company, and on and prior to the same date, the defendant, the Light & Development Company (the defendant, Gibony Houck having no interest in the matter), was the owner of a majority, if not all, of the stocks and bonds of the Cape Girardeau Water Works and Electric Light Company of Cape Girardeau, Missouri. At that time the corporate franchise of the latter company was about to expire, and it was then asking for a new charter in the name of the Missouri Public Utilities Company, instead of the Cape Girardeau Water Works & Electric Light Company.

The defendant was and is a holding corporation, owning and operating water works, electric light and power plants throughout Southeast Missouri, with its principle place of business in the City of St. Louis, Missouri.

The articles of association of the Cape Girardeau-Jackson Interurban Railway Company were signed and acknowledged on the 4th day of October, 1902, filed in the office of the Secretary of State, and a certificate of incorporation issued October 16, 1902. The said articles of association of the said Railway Company recited: That the said Railway Company was organized

under the provisions of Article "2," Chapter "12," of the Revised Statutes of 1899. That the said company was "formed for the purpose of constructing, maintaining and operating a standard gauge railroad in the City of Cape Girardeau, County of Cape Girardeau and State of Missouri, and from the City of Cape Girardeau to the City of Jackson, in the said county, and in said City of Jackson; and the said articles of association further recited that "the approximate length of said railroad is eighteen miles, situated wholly in the County of Cape Girardeau, in the State of Missouri."

The plaintiff, Cape Girardeau-Jackson Interurban Railway Company, had the right, under its franchise, also had the power, to furnish heat, power and light to the public.

That on January 4, 1913, the buildings and machinery of the Street Railway Company had been damaged or destroyed by fire, which prevented the company from prosecuting its business. This, in fact, as I understand the record, was one of the inducing causes which lead to the execution of the contract of purchase before mentioned.

On the 7th day of September, 1892, the City of Cape Girardeau—a city of the third class—by ordinance numbered 484, granted to William Penny and L. S. Joseph and their associates and assigns a franchise to build and operate a street railroad on certain streets, naming them, in that city. On October 14, 1892, Penny and Joseph accepted the franchise. Under this ordinance 484 a street railroad was constructed and operated by horse power on the streets named in Cape Girardeau.

On September 30, 1902, the City of Cape Girardeau, by ordinance, No. 637, granted to James S. Lapsley and his associates and assigns a franchise "to construct, maintain and operate a street railway and an electric light, heat and power plant within the corporate limits of the City of Cape Girardeau." The preamble to this ordinance recites:

"Whereas, it is proposed by James S. Lapsley, his associates or successors or assigns, or a corporation to be formed for the purpose, to construct, operate and maintain in the City of Cape Girardeau, a street railway, and speedily thereafter to extend same to the City of Jackson . . . and operate and maintain a line of electric cars thereon and also to construct, operate and maintain an electric lighting plant in the City of Cape Girardeau," etc.

Section 1 of the ordinance names the streets and the distances on the streets the street railroad was to be operated.

Section 11 of the franchise authorizes the grantee. to · construct, maintain and operate an electric light, heat and power plant within the corporate limits of the city and to furnish heat and power and light during the life of the franchise, with a right to have the same renewed.

Section 12 authorized Mr. Lapsley and his grantees to erect poles, lamps, wires and fixtures, upon, along and over the streets of the city with the right to extend the same.

And section 13 provided that Lapsley and his grantees were authorized to contract with the city for furnishing light for municipal purposes.

Soon after obtaining this franchise from the City of Cape Girardeau, to-wit, on October 4, 1902, James S. Lapsley, R. F. Walker and others signed articles of association for the incorporation of the Cape Girardeau-Jackson Interurban Railway Company.

The articles of association recite that the incorporators have · associated themselves together under Article II, Chapter 12, of the Revised Statutes 1899, for the purpose of forming a "corporation" "to construct, operate and maintain a standard-gauge railroad line for public use in the conveyance of persons, property, mail, express . . . in the City of Cape Girardeau, County of Cape Girardeau and State of Mis-

souri, and from the City of Cape Girardeau to the City of Jackson in said County."

The "corporation" was capitalized at $300,000, divided into three thousand shares, each share of the par value of $100.

Mr. Lapsley then sold and assigned to the Cape Girardeau-Jackson Interurban Railway Company the franchise granted to him by the City of Cape Girardeau, being ordinance No. 637, for the building, operating and maintaining a street railroad within the corporate limits of the City of Cape Girardeau.

Afterwards the Cape Girardeau-Jackson Interurban Railway acquired by purchase the franchise and horse railroad that was authorized and constructed under ordinance No. 484 to William A. Penny and L. S. Joseph in 1892.

Up to 1904 or 1905, nothing had been done by the stockholders of the Cape Girardeau-Jackson Interurban Railway Company toward the construction or building of a street railway within the corporate limits of the City of Cape Girardeau. About that time William H. Harrison and John H. Himmelberger were induced to become interested in the enterprise. At that time all the stock in the Cape Girardeau-Jackson Interurban Railway Company was owned by William H. Miller, David A. Glenn, L. S. Joseph, Rodney G. Whitelaw, Robert W. Matteson, J. H. Himmelberger, R. E. Gurley, R. A. Ogle and William H. Harrison, all residents and citizens of the City of Cape Girardeau, except Gurley and Ogle.

The street railway company had no money or funds with which to start the work of construction. A meeting of the stockholders was held and William H. Harrison was elected president of the company and Rodney G. Whitelaw was elected secretary and treasurer.

The stockholders then entered into a written trust agreement, called on the trial and in this case a "pooling agreement," by and in which they jointly agreed that the entire stock of the street railway company should be deposited with the Southeast Missouri Trust

Company of Cape Girardeau as trustee for the stockholders. The "pool agreement" further provided that no one of the stockholders could or should sell his stock in the street railway company without the consent of all the other stockholders.

After this trust arrangement was made by the stockholders of the street railway company the officers of the company made arrangements for the borrowing of $80,000 or $100,000 from a banking institution in St. Louis, to commence the construction and building of a street railroad in the City of Cape Girardeau. This loan was at first secured by a note executed by the street railway company, with a guarantee for its faithful payment signed by each of the seven stockholders. A little later, to-wit, on the 7th day of April, 1906, the street railway company authorized the issuing of $300,000 of first mortgage bonds and the execution of a mortgage or deed of trust on all of its property, consisting of rolling stock, equipment, leases, lands, franchises, and "its line of railway as now constructed and operated in the City of Cape Girardeau, aggregating a distance of five miles in length, on the following named streets and alleys," naming the streets and alleys over and upon which said railroad was construct ed.

Three hundred thousand dollars of bonds were issued and deposited with the trustee, but only $100,000 were certified to by the trustee. The other $200,000 were left in the custody of the trustee. These $100,000 of bonds were then deposited with the banking institution in St. Louis, as collateral security, to secure the loan which then amounted to $100,000. This loan was still evidenced by a note of the street railway company, and its payment was also guaranteed by the written guaranty of each of the seven resident stockholders above named. The other $200,000 worth of bonds was deposited with the trustee, but have never been certified to by the trustee, nor negotiated by the street railway company.

With this borrowed money the street railway company erected a power plant in the City of Cape Girardeau and constructed over the streets and alleys of said city a street railway system of over five miles in length. The street railway company was operating its railroad when on January 5, 1913, its power plant and many of its cars and car barns were destroyed by fire.

In the meantime, Messrs. Gurley and Ogle had sold their interest in the road to the other stockholders, leaving D. A. Glenn, William H. Miller, L. S. Joseph, Rodney G. Whitelaw, Robert W. Matteson, J. H. Himmelberger, and William H. Harrison each holding a one-seventh interest in the stock.

The following is a brief history of the Light and Development Company, and its predecessor's interest in the City of Cape Girardeau, as disclosed by the evidence in this record.

In 1892 or 1893 the City of Cape Girardeau granted to the Cape Girardeau Water Works and Electric Light Company, a Missouri corporation, franchises to construct and operate a system of water works and an electric light plant in said city, and had entered into contracts with the Water Works and Electric Light Company for water and light, and the twenty years or charter rights of these companies were about to expire.

In 1913 the Missouri Public Utilities Company had acquired all the stock of the Cape Girardeau Water Works and Electric Light Company and was operating, at that time, both the water works and electric light plants in said city under contracts theretofore made with said city by said Water Works and Electric Light Company .

The Missouri Public Utilities Company was owned by the United States Public Service Company of Delaware, and the Light and Development Company of St. Louis, appellant, owned a controlling interest in the United States Public Service Company of Delaware.

Neither of these controlling corporations was domiciled in Cape Girardeau. Neither of them had an office in the City of Cape Girardeau.

Under these conditions the appellant, in February, 1913, made overtures to the stockholders of the street railway company, for the purchase of the stock and bonds and railroad of the Cape Girardeau-Jackson Street Railway Company.

On the 17th day of February, 1913, defendant entered into the following contract of purchase with the plaintiffs.

"Agreement between Stockholders of the Street Railway Company and the Street Car Company, and Light and Development Company.

"The object and purpose of this agreement is as follows:

"First: To make a temporary arrangement for the operation of the present street car system in the City of Cape Girardeau (as an emergency agreement) in order to keep the street car system in operation.

"Second: To fix the price, conditions, terms and time and manner of purchase, and handling of all capital stock, and bonds of said street car railway company by the Light and Development Company.

"Therefore, this agreement, made and entered into this ——— day of January, 1913, by and between D. A. Glenn, L. S. Joseph, R. W. Matteson, W. H. Miller, J. H. Himmelberger, Rodney G. Whitelaw and W. H. Harrison, hereinafter referred to for convenience as stockholders, and Cape Garardeau-Jackson Interurban Railway Co., a corporation, hereinafter referred to for convenience as Street Railway Company, parties of the first part, and the Light and Development Company, a corporation, of St. Louis, Missouri, hereinafter referred to as Development Company, party of the second part, witnesseth:

"That the said parties of the first part, for valuable considerations this day received from said party, do

hereby make and enter into the following agreement with said second party:

"Division One of this Contract.

"Section 1. The Light and Development Company shall operate the street car system in the City of Cape Girardeau temporarily as follows:

"(a) Operating Expense. Expense of operating the present street car system in the said City of Cape Girardeau shall be paid by the Development Company, it being unterstood that said Development Company is hereby given the right to use all of the machinery, equipment and property of said street car system, that it may require in operating said system, and to that end is hereby given the right to remove any machinery or equipment of said Street Railway Company that said Development Company may require, from the plant of the Street Railway Company to the plant of the Cape Girardeau Water Works and Electric Light Company (hereinafter referred to as Water and Light Company). And in the event of a failure to purchase all the capital stock and bonds of said first parties, as hereinafter provided for, then, and in that case, the Development Company shall return to the Street Railway Company all machinery and equipment, so taken as aforesaid, in as good condition as when received, usual wear and tear excepted. (For the purpose of indentifying office and operating supplies an inventory is hereto attached and made a part of this contract.)

"(b) Improvements. Any permanent rehabilitation, extension, addition or improvement that may be required or made on said street car system shall first be approved by the president of said Street Railway Company. And in the event of a failure to purchase, as hereinafter provided for, the parties of the first part shall reimburse and repay to the Development Company all sums of money so laid out and expended by it.

"(c) Repairs. The Development Company shall make the repairs necessary on the damaged building of the Street Railway Company to protect the machinery

therein from being exposed to the weather, but shall not rebuild the car shed, said damage being caused and repair made necessary by reason of the fire of January 4, 1913.

"(d) Debts. The Street Railway Company shall furnish a list of all the debts owing by the Street Railway Company, amounting to the aggregate sum of $1933.61, which said sum of $1933.61 the Development Company assumes and agrees to pay under this temporary arrangement of operation, in addition to the expense of repairs to be made, as hereinbefore set out. It being expressly understood and agreed between the parties hereto that this temporary arrangement is made upon the representation of said first parties that the Development Company shall realize in cash out of the assets of said Street Railway Company the sum of $4313, four thousand dollars of said sum being on account of fire loss, which said amount is to be paid by said first parties to said second party with· the understanding that the Development Company would be required to expend the estimated sum of twenty-five hundred dollars to repair the damage on account of fire loss as aforesaid. Therefore, it is expressly agreed that if the amount actually expended by the Development Company on account of fire damage should be less than said estimated sum of twenty-five hundred dollars, then and in that case the Street Railway Company shall be entitled to and shall receive a credit for the difference between the amount actually expended on account of said repairs and the said sum of twenty-five hundred dollars. All other indebtedness of the Street Railway Company is to remain the debt and obligation of said Street Railway Company under this temporary arrangement for operating.

"(e) Consideration. The Development Company shall receive the entire receipts derived from operating the said street car system, but shall receive no other or further pay for operating said system except the said

sum of forty-three hundred and thirteen dollars, for the purpose and in the manner hereinbefore set out.

"Division Two of said Contract.

"Fixing Price, Conditions, Terms, Time and Manner of Purchase:

"Section 1. The Development Company shall purchase all of the capital stock and bonds of said Street Railway Company from said first parties upon the condition hereinafter set out.

"Price. The Development Company agrees to purchase all of the capital stock and all of the bonds from the said stockholders, and said stockholders agree to sell the same at the price and sum of one hundred and fifty-three thousand dollars. Said purchase to be made and bonds to be disposed of upon the conditions, terms at the time, and in the manner hereinafter set out.

"(2) Terms, Manner of Payment and Disposition of Bonds.

"In the event of the purchase under this agreement the terms shall be as follows:

"The sum of fifty-six thousand dollars shall be paid in cash to said stockholders, and the sum of ninety-seven thousand dollars in bonds of said Street Railway Company with coupons on said bonds canceled up to and including the year 1914. And for the fifty-six thousand dollars in cash, paid as aforesaid by said Development Company, the said Development Company shall receive fifty-six thousand in bonds of said Street Railway Company, with coupons canceled up to and including the year 1914.

"The said Development Company agrees to purchase from said stockholders, during the year 1915 and each year thereafter, at least fifteen thousand dollars of said ninety-seven thousand dollars in bonds, at par until all of said ninety-seven thousand dollars in bonds, paid to the stockholders as aforesaid, shall have been purchased from said stockholders. Said bonds to be purchased and taken up numerically, and all of said ninety-seven thousand dollars in bonds shall be taken up first, and

before .the taking up and paying off of the fifty-six thousand dollars in bonds taken over by said Light and Development Company, as hereinbefore set out. The remainder of said bonds of said Street Railway Company, namely, one hundred and forty-seven thousand dollars, are to be held in the treasury of said Street Railway Company by said Light and Development Company, with coupons canceled up to and including December thirty-first, 1912, which said bonds shall be used for extensions and improvements of the Street Railway Company. It being understood that all the debts of said Street Railway Company, except said bonded indebtness and the debts assumed by the Development Company under the operating agreement above set out, have been paid or assumed by said stockholders, and that the Development Company shall acquire said property free and clear of all claims, causes of action, debts and obligations except the debts specifically mentioned and assumed by the Development Company under this agreement.

"(3) Conditional Contract of Purchase.

"It is expressly agreed by and between all the parties hereto that this shall be treated as a conditional contract of purchase, and that the Development Company shall not purchase said stock and bonds until after the following things have been done:

"The said stockholders shall obtain for, and in the name of, said Street Railway Company a legal and valid statutory franchise covering the statutory period authorizing said street railway company to construct, maintain and operate its street car system in the City of Cape Girardeau, Missouri, which said franchise shall embrace the streets and impose the conditions imposed in the ordinance now held by the said Street Railway Company, and in the form of said ordinance, except the conditions requiring an extension to Jackson, Missouri, and providing for telephone and lighting systems shall be eliminated.

277 Mo.—38

"It is also expressly understood and agreed that the Development Company will not purchase the stocks and bonds as above mentioned until after satisfactory franchises have been granted by the City of Cape Girardeau, Missouri, to the Cape Girardeau Water Works and Electric Light Company, or its successors, for its water system, electric system and gas system, and until after contracts have been renewed with said city to furnish water and light for said City of Cape Girardeau, Missouri.

"It is further agreed that within thirty days after all of the above mentioned franchises have been granted and accepted for the statutory period, and contracts made or renewed with said city for furnishing water and light to said city for the statutory period, the Development Company shall take over and pay for said stock and bonds and settle for same at the price and in the manner and form hereinbefore set out.

"It is further agreed, by and between all the parties hereto, that if for any cause the said Street Rrailway Company or the said Water and Light Company, or either of them, should fail to obtain all or any one of the franchises above mentioned, or should fail to renew said contracts or either of them for water and light as above mentioned, before June 1, 1913, then this obligation to purchase shall become null and void and have no force nor effect whatever as a contract requiring said Light and Development Company to purchase said stock and bonds, unless the same be extended by the Development Company to January 1, 1914, for the purposes and in the manner hereinafter set out.

"It is further expressly understood and agreed, by and between all the parties hereto, that in the event of a failure to acquire and obtain all or any one of the franchises or contracts hereinbefore mentioned, on or before June 1, 1913, then and in that case the Development Company is hereby given the privilege of extending the terms of this conditional contract of purchase to

January 1st, 1914, it being agreed that in case of any such extension all of the terms, conditions and provisions of this agreement as to the purchase of said stock and bonds shall remain in full force* and effect during such extension.

"It is further understood and agreed that in case of any such extension the operation of the street-car system shall continue under the terms of the temporary arrangement above set out during such period of extension of time.

"It being expressly understood, by and between all the parties hereto, that should the said Water and Light Company, or its successors, fail to get all or any one of the franchises above mentioned, or fail to get the contracts or either of them above mentioned, or should the Street Railway Company fail to get a franchise above mentioned on or before June 1, 1913, or in the event of an extension of time, as hereinbefore provided for, then, on or before January 1, 1914, then and in that case all of the terms and conditions of this contract referring to and respecting the purchase of the stock and bonds above mentioned shall become null and void, and the parties hereto shall have a settlement under this contract and the operation of the street car system shall again be assumed and taken over by the parties of the first part in accordance with the terms and provisions of this contract.

"It is understood that the development company commenced operating the street car system, under the terms of the temporary arrangement embraced in division 1 of this contract, on Monday, January 13, 1913. It is further understood that nothing in this contract shall be so construed as to make it a contract of purchase by the Development Company until after the contracts and franchises, above mentioned, have been obtained and that any extension of time for operating the said street-car system or to give time in which to obtain said franchises shall not in any way change the

status of the parties nor effect any of the terms or provisions respecting the purchase.

"Executed in triplicate this 17th day of February, 1913."

Then follows the signatures of the parties.

In pursurance to the contract of February 17, 1913, the stockholders and city officials did use their influence and every lawful means at their command to secure and did secure for the defendant a "satisfactory franchise and contract" for the Missouri Public Utilities Company, the successor of the Cape Girardeau Water Works and Electric Light Company.

On November 1, 1913, the City of Cape Girardeau granted to the Missouri Public Utilities Company, successor of the Cape Girardeau Water Works and Electric Light Company, a new franchise to construct, maintain and operate a water works system for supplying the City of Cape Girardeau and inhabitants thereof with water, also the right to construct, maintain and operate an electric light and power plant for supplying the City of Cape Girardeau and inhabitants thereof and vicinity with light and power and the use of the streets and alleys to carry the same. This is Ordinance No. 1043.

Contracts were then made by defendant through its subsidiary corporation, the Missouri Public Utilities Company, with the City of Cape Girardeau, and its inhabitants, for water and light. These franchises and contracts were "satisfactory" and accepted by the Missouri Public Utilities Company on December 20, 1913.

Before the passage of the ordinance 1043 the president of defendant visited the City of Cape Girardeau and assured members of the city council and others that if the City of Cape Girardeau would grant to his corporation the renewal franchises for water and light, the appellant company would take over the street railway property under his contract of February 17, 1913, with respondents, just as soon as the City of Cape

Girardeau gave his corporation renewal franchises and renewal contracts for the sale of light and water.

After the city had granted to appellant through its subsidiary corporation, the Missouri Public Utilities Company, the franchises and contracts just above mentioned, the city undertook to and did give to the Cape Girardeau-Jackson Interurban Railway Company a new franchise for a street railway, in which (upon the demand of defendant under the contract) the Railway Company eliminated its right to construct, operate and maintain a lighting, heating and telephone system in said city and also the right to extend an interurban railroad to Jackson in said county. This ordinance was passed on December 11, 1913.

The contract of February 17, 1913, between plaintiffs and defendant was written by the latter's counsel.

Ordinance No. 1046, granting to the Street Railway Company the right to operate a street railroad and eliminating from it the privilege of selling light and power and a telephone system in the City of Cape Girardeau, was also written by counsel for the defendant.

Subsequent to the making of the contract of February, 1913, and prior to the introduction of ordinance 1046 in the city council, it was claimed by the defendant that the Lapsley ordinance of 1902 was irregular, in that the abutting property owners had not petitioned or consented to the laying of the street railroad on the streets named. To obviate that difficulty in the proposed new ordinance then about to be introduced, the Street Railway Company procured the written consent of a majority of the abutting property owners to be filed in the city clerk's office as provided by statute. Counsel, in writing ordinance 1046, made the city council find as a matter of fact that a majority of the property owners had signed said petition and had given their assent to the use of the streets over which the Street Railway Company was then operating over such streets as the Street Railway Company had the right to operate, but had not yet exercised. Counsel also in writing that

ordinance makes the council "further find and declare that the Cape Girardeau-Jackson Interurban Railway Company is an incorporated company, organized under the laws of the State of Missouri, to construct, maintain and operate a street railroad in the City of Cape Girardeau, and that it has now complied with the statutes of the State of Missouri requiring the written assent, permission and petition of the owners of the land representing more than one half of the frontage of the streets or parts thereon now used for its railroad and street car purpose and is entitled to a valid and statutory franchise authorizing and permitting it to maintain and operate its said railroad as now located on the streets and parts of streets above set out."

Section 5 of this new franchise states: "That there is hereby granted by the City of Cape Girardeau, Missouri, to be hereinafter designated as the grantor, for a period of twenty years, unto the Cape Girardeau-Jackson Interurban Railway Company, its successors or assigns, to be hereafter designated as the grantee, the rights, privileges and franchise as follows, to wit: To construct, operate and maintain a street railway system to be operated by electricity upon, along and over the streets, avenues, alleys, and other public highways in said City of Cape Girardeau, as follows, to-wit:" Then follows the names of the streets and the distances of each that the Street Railway Company had the right to use.

In Section 16 of said ordinance this language is used: "It is understood that the grantee is not required to extend its interurban line to Jackson, as provided for in the original grant, nor shall it be required to install and operate the lighting and heating plant provided for in the original franchise."

Section 17 of Ordinance 1046 is as follows: "It is understood by the grantor at this time that the grantee is contemplating and negotiating the sale of its property and franchise, and that under the provisions of Section 20, of Article 12, of the Constitution of the

State of Missouri, the assent of the city council to make a transfer is required, and the grantor hereby consents to a transfer of the franchises, grants and privileges and property held by the grantee, including the franchise herein granted.''

This ordinance provides that the grantee or its successors or assigns shall file its written acceptance thereof within ten days after the passage of this ordinance. The attorney for defendant who wrote the contract of February 17, 1913, between plaintiffs and defendants, wrote the Ordinance 1043 for the renewal franchise of the Water Works and Electric Light Company; also the Ordinance 1046 for the Cape Girardeau-Jackson Interurban Railway Company; also the ' acceptance for the Street Railway Company, its successors and assigns, and had it signed by W. H. Harrison, its president, and attested by Rodney G. Whitelaw, its secretary.

After the making of the contract of February 17, 1913, the General Assembly of the State passed what is known as the ''Public Service Commission Law.'' On December 23, 1913, the defendant through its subsidiary corporation, the Missouri Public Utilities Company, and its attorney, presented to the Public Service Commission at Jefferson City, a petition praying authority to approve the electric light and water franchises granted by the City of Cape Girardeau and its contract made thereunder. Approval was granted.

On the same day and at the same time defendant presented a petition to the Public Service Commission in behalf of the Cape Girardeau-Jackson Interurban Railway Company, David A. Glenn, Rodney G. Whitelaw, R. W. Matteson, W. H. Miller, W. H. Harrison, John H. Himmelberger and L. S. Joseph and the Light and Development Company, praying said Commission for its approval of the franchise granted to the Cape Girardeau-Jackson Interurban Railway Company, Ordinance 1046, for the construction and operation of a street railway in the City of Cape Girardeau and for the sale

of the stocks and bonds of said Cape Girardeau-Jackson Interurban Railway Company to the Light and Development Company of St Louis. Among other things recited in their petition is the following:

"Reasons for Sale.

"(1) That the present owners of the capital stock and bonds of the street railway company were the organizers of the Cape Girardeau-Jackson Interurban Company; that they obtained a franchise from the said City of Cape Girardeau to operate a street car system within said City of Cape Girardeau; that is was the intention, at the time of the organization of said company, to extend said line from the City of Cape Girardeau to the City of Jackson; that after considerable expense in their efforts to make the connecting line between said cities they found that the only feasible route for a street car line had been adopted by steam line, and the line connecting the two cities was abandoned; that the company continued to operate its system in the said City of Cape Girardeau until about January 1, 1913, from its own power house and power plant; that on or about said 1st day of January, 1913, the power house and power plant of said street railway company were greatly damaged by fire; that the management of said street railway company made a temporary and an emergency arrangement with the Light and Development Company (the company then operating the light plant in the City of Cape Girardeau) to keep the street car system in operation; that at the time of this temporary arrangement the stockholders of the street railway company also contracted to sell and transfer to the Light and Development Company the capital stock and bonds of the street railway company, the tentative agreement was entered into on January 13, 1913, and the papers were finally executed on the 17th day of February, 1913, with the agreement reciting that it was as of date January 13, 1913.

"That the street car company had never paid any dividends, and, on the contrary, had been running at

a loss during the whole period of operation of said system; that at the time of the sale and transfer the Light and Development Company was a practical operating company engaged in the development of public service or public utility properties; that it was then operating the water and light properties in said City of Cape Girardeau; that the sellers knew the Light and Development Company to be a practical operating company and also financially in a position to develop its property; that owing to the fact that the property had been operated at a loss up to the date of the fire the street railway company found it necessary to make some arrangement for the sale of the property, and to insure the continued operation of the street car system found it necessary to make the temporary arrangement with the Light and Development Company to operate its cars.

"That the stockholders of the street car company are all men engaged in business other than the operation of public utilities and were unwilling to stand further personal losses on account of the street car property, and were unable to finance the property in the matter of making extensions and developing the property by selling the bonds of the company.

"That, on the other hand, the Light and Development Company is composed of an organization of practical operators, is in a position to finance its properties for the purpose of development and can and will operate the same to better advantage, and more economically, than could be done by the management of the street car company.

"That this sale and transfer is necessary in order to insure the continued operation of a street car system in the City of Cape Girardeau; that it is the opinion of the sellers that if the property is handled by experienced operators it would be a valuable property; on the other hand, that any attempt to continue operations by the old company, under existing conditions, would render it necessary to abandon the system.

"That the street car company had, prior to its sale to the development company, been endeavoring for some time to make disposition of its property and franchises; that this contract was made for the sale and transfer of the stocks and bonds prior to the creation of the Public Service Commission of the State of Missouri.

"That at the time of said contract the street car company was required to obtain a statutory franchise from the city authorities and property owners of said City of Cape Girardeau.

"That the Light and Development Company was then negotiating with the City of Cape Girardeau for new franchises and contracts for water and light in said city; that the completion of the transfer of the stock and bonds was delayed and conditioned upon the granting of said franchises.

"That pending said contract of sale the Light and Development Company organized the Missouri Public Utilities Company, and the water and light franchises and contracts were granted to the Missouri Public Utilities Company.

"That the Light and Development Company is now ready, willing and able to carry out its contract of purchase of the stocks and bonds under the terms of its contract of purchase.

"That the contract for the sale and transfer of said stock, signed on the 17th day of February, 1913, is hereto attached and marked 'Exhibit B' and made a part of this application.

"That Ordinance No. 1046, entitled 'An Ordinance granting to the Cape Girardeau-Jackson Interurban Railway Company, a corporation organized and existing under the laws of the State of Missouri, and domiciled in the City of Cape Girardeau, Missouri, its successors or assigns, a franchise to construct, maintain and operate a street railway in certain public streets and highways within the corporate limits of the City of Cape Girardeau, subject to certain conditions,' was passed by the City Council of the City of Cape Girardeau,

Missouri, on the 8th day of December, 1913, and approved on the 11th day of December, 1913, which said ordinance is hereto attached and marked Exhibit 'C'; and made a part of this application.

"Wherefore, petitioners ask that the Public Service Commission of the State of Missouri make an order approving and authorizing the use and exercise of the franchise granted to the Street Railway Company by the City of Cape Girardeau, Missouri. And if the Commission finds that under the law it has any jurisdiction or authority to make any orders touching the contract for the sale of the stock and bonds made prior to the creation of this Commission, then, in that case, petitioners further ask that the Commission make an order authorizing the sellers, above named, to sell and transfer all of the stock and bonds of the Cape Girardeau-Jackson Interurban Railway Company, a corporation of Cape Girardeau, Missouri, to the Light and Development Company, a corporation of St. Louis, Missouri, and approve the contract of sale of said stocks and bonds made on the 17th day of February, 1913, and to make such other and further orders as to the Commission may seem proper.

"Dated at Cape Girardeau, Missouri, this 20th day of December, 1913."

. Then follows the signatures of all the parties.

The Public Service Commission, after hearing said parties, gave its consent and approval to the new franchise given to the Cape Girardeau-Jackson Interurban Railway Company to construct, operate and maintain a street railway on and over the streets of the City of Cape Girardeau, but found that the contract for the sale and transfer of the stocks and bonds of the Street Railway Company to the Light and Development Company had been fully consummated and concluded and the rights of the parties thereunder fixed on February 17, 1913, prior to the time when the Public Service Law went into effect.

On the 24th day of December Mr. Harrison returned from Jefferson City and in the next few days withdrew from the Southeast Missouri Trust Company all of the stock of the Cape Girardeau-Jackson Interurban Railway Company and the "pool agreement" relating thereto and put the same in the possession of Mr. Rodney G. Whitelaw, the secretary and treasurer of the company.   Mr. Harrison did not know to whom the Light and Development Company of St. Louis desired the new stock to be issued, so he called on Mr. Kelso for that information.   The latter wrote in pencil the names and number of shares that each stockholder was to have on a slip of paper and put the same on the desk of Mr. Harrison.   On this slip of paper are the following names:  H. Wurdack, 1 share No. 49;  Horace W. Beck, 1 share No. 50;  E. N. Kurtz, 1 share No. 51; balance to the Light and Development Company, 2,997 shares No. 52.

In accordance with the written instructions of the president, the secretary, Mr. R. G. Whitelaw, cancelled all the stock certificates standing in the name of the respondents and issued new certificates as above directed.

The "sticker" or guaranty of the Light and Development Company for the faithful payment of the $97,000 bonds of the Street Railway Company had been prepared by attorney for defendant and printed by respondents and made ready to "stick" or attach to the bonds upon the completion of the contract.

Mr. Harrison, as president, and Mr. Whitelaw, as secretary, for the Street Railway Company, had made all arrangements to go to St. Louis and be there on January 1, 1914, for the purpose of delivering to the appellant all of the stocks and bonds of the Street Railway Company, and to complete and fulfill the contract sued upon.   But just before their leaving for St. Louis, counsel for defendant came into the office of Mr. Harrison and informed him that he had just discovered that the Cape Girardeau-Jackson Interurban

Railway Company was without power and authority to accept from the City of Cape Girardeau the franchise it had given the Railway Company, Ordinance 1046; that he had just discovered that the City of Cape Girardeau, Missouri, was without power and authority to grant to the Cape Girardeau-Jackson Interurban Railway Company a "legal and valid statutory .franchise covering the statutory period" as set forth in Ordinance 1046; that he had just discovered that the Cape Girardeau-Jackson Interurban Railway Company was incorporated under the statute authorizing the incorporation of commercial railroads and not under the statute authorizing the incorporation of street railroads; "and that he could not recommend to his company the compliance with the contract until that defect had been cured."

But at the time counsel gave the above notice to Mr. Harrison, he also stated that there might be some other statute or authority authorizing the granting and acceptance of Ordinance 1046, and that he was r-'lling to and would make a further research of the statute. He was then asked by Mr. Harrison if he had notified Mr. Wurdack of his discovery and he reported that he had not. A few days later Mr. Wurdack called Mr. Harrison over the telephone and wanted to know when he would be up to complete the contract; Harrison replied (relying upon counsel's declaration above stated) that the respondents were not quite ready at that time to go up, but would be soon.

Some days afterward, counsel notified Mr. Harrison that he had been unable to find any authority authorizing the City of Cape Girardeau to grant the franchise Ordinance 1046 (the ordinance he had written) to the Cape Girardeau-Jackson Interurban Railway Company to operate a street railroad over the streets of that city, and that he could not recommend to the appellant the execution of the contract.

Soon after that plaintiffs were advised by their counsel that the City of Cape Girardeau had the

power to grant the ordinance that counsel for defendant had drawn, No. 1046, and that it was a legal, valid and statutory franchise, and that the Street Railway Company had the right to operate its cars on the streets of said city.

The appellant was then appealed to to carry out its contract, and its president expressed a willingness to do so, if it was held that the franchise granted to the Cape Girardeau-Jackson Interurban Railway Company was a legal, valid and statutory franchise.

After suit was brought appellant set up in one paragraph of its answer a failure of respondents to deliver or tender to the appellant its stocks and bonds within the time stated in the contract.

At the close of plaintiffs' evidence, and again at the close of all of the evidence in the case, counsel for the defendant offered a demurrer thereto, each of which was by the court overruled and the defendant duly excepted.

I.  Counsel for the defendant insist that the trial court erred in refusing the demurrer requested at the close of the plaintiffs' case, and also at the close of all of the evidence introduced.  The principle reason assigned for this insistence is that the **Railway Franchise: Statutes.** contract of sale mentioned in the evidence provided that the plaintiffs should obtain for and in the name of the Street Railway Company a legal and valid franchise from the City of Cape Girardeau authorizing it to construct, maintain and operate a street car system upon and along the streets of that city, while the evidence affirmatively shows that they wholly failed to obtain such a franchise for the company, and therefore, the contract had not been performed on the part of the plaintiffs and consequently specific performance thereof will not lie, the specific contention being that the City of Cape Girardeau had no power or authority to grant to the Cape Girardeau-Jackson Interurban Railway Company, a standard-gauge railroad company, organized

under Article 2 of Chapter 12, Revised Statutes 1899, a valid franchise as set forth in Ordinance No. 1046, before mentioned; that is, the ordinance applies to a street railroad company, while the evidence shows that the Cape Girardeau-Jackson Interurban Railway Company is a commercial or standard-gauge railroad company, as before stated.

The above contention is based upon Sections 9493 and 9494, Revised Statutes 1909. The first section mentioned provides that no incorporated town or city of this State shall have power to grant to any person or corporation the right to construct and operate upon and over the streets of any such town or city any elevated, underground or other street railway without compliance with the conditions stated in said Section 9494.

The latter section provides that: Before granting a franchise for the construction and operation of an elevated, underground or other street railroad in any such town or city, the authorities of such city shall, by ordinance, establish the route and define the terms and conditions of such franchise, and locate all depots, stations, turnouts, etc. Also that the party to which the franchise may be granted shall be an incorporated company under the laws of this State, to construct, maintain and operate a street railroad in the town or city by which such franchise is granted. This same section then at great length provides for the payment of compensation for the property to be taken, and the damages that will be done to property not taken, by the construction and operation of the street railroad; the nature of the franchise and the road to be constructed and operated, and the court in which such proceedings must be instituted, etc.

Under the undisputed evidence in this case, the Cape Girardeau-Jackson Interurban Railway Company was a standard-gauge rairoad, and it is contended by counsel that the City of Cape Girardeau had no power under said Sections 9493 and 9494 to grant to it a

franchise to construct and operate a street car system upon and over the streets of that city,—they insisting that they only apply to incorporated street railroad companies, and not to standard-gauge railroads, to which class the Cape Girardeau-Jackson Interurban Railway Company belongs.

It must be conceded that, if those sections of the statutes apply to cities of the third class, to which the City of Cape Girardeau belongs, then said city had no power or authority to grant to the Cape Girardeau-Jackson Interurban Railway Company a franchise to construct and operate a street railroad upon and over the streets of that city. Those sections according to their plain letter and meaning only apply to street railway companies and not to standard-gauge roads. In fact we do not understand counsel for plaintiffs to dispute that proposition, if said statutes apply to cities of the third class. But their contention is, that those sections have no application to cities of the third class, but upon the contrary, that they are governed by Section 107, Laws 1887, page 84, which is Section 1576, Revised Statutes 1889, as amended by Section 105, Laws 1893, page 98, now Section 5855, Revised Statutes 1889, and Section 9250, Revised Statutes 1909.

It will be seen by reading the last section that cities of the third class "have the sole authority, by ordinance, to grant the right to any person or persons, or corporation, to make and construct railroads and street railroads in any street or highway of the city, and to control and regulate the use thereof."

This language of the statute is very broad, and authorizes a city of the third class by ordinance to grant to *any person or corporation* the right to construct and operate a railroad or street railroad in the streets of any such city, and to control and regulate the use thereof. In other words, under the broad power given to the city by said Section 9250 it had the undoubted power to grant to the Cape Girardeau-Jackson Interurban Railway Company, a standard-gauge railroad com-

pany, the right to construct and operate a street railroad in said city. In fact, until 1899, long after the passage of the statutes mentioned, there was no general law authorizing the incorporation of street railroad companies. Up to that year all street railroads were constructed and operated by individuals, corporations created by special acts of the Legislature, or by some business corporation organized and incorporated under Aricle 2 of Chapter 12, Revised Statutes 1889.

In 1899 the railroad statutes, if I may so denominate them, were amended by the enactment of a new section, being Section 1186, which for the first time authorized the incorporation of street railroad companies, but prior to that enactment we had no general statute upon the subject.

A similar question to the one here involved was presented to this court in the case of the St. Louis & Meremec River Railroad Co. v. City of Kirkwood, 159 Mo. 239. The principle difference between that case and the one at bar is that in that case the plaintiff was a street railway company, incorporated to carry "passengers, and property" between and within the cities of Kirkwood and St. Louis, while in this case, the Cape Girardeau-Jackson Interurban Railway Company is a standard-gauge railroad company, incorporated also to carry passengers and property between and within the cities of Cape Girardeau and Jackson. In the former case the city council of the City of Kirkwood, by the franchise ordinance, limited the authority of the company to the carriage of passengers only within the limits of the city of Kirkwood, while in this case the city of Cape Girardeau did practically the same thing by granting to the Cape Girardeau-Jackson Interurban Railway Company the right to construct and operate a street railroad within the limits of that city. The difference is only in name; both had the power to carry passengers and freight, and in the Kirkwood case the company was required by the franchise ordinance to surrender its corporate right to carry freight, while in

the case at bar the Cape Girardeau-Jackson Company was required by the franchise ordinance to construct and operate a street car system in that city and by necessary implication to surrender any and all corporate rights insofar as the City of Cape Girardeau was concerned, if any it had, not granted to it by said franchise ordinance. In the Kirkwood case, this court held that the city had the authority to require the company to surrender its corporate right to carry mail and express within the corporate limits of the city, and by parity of reasoning the City of Cape Girardeau had the right to require the Cape Girardeau-Jackson Interurban Company to surrender all of its corporate rights, insofar as the city was concerned, not granted to it by the franchise ordinance. The former was by express limitation and the latter by necessary implication; but the effect in both cases was the same.

But, independent of the ruling in the Kirkwood case, and what is here said regarding it, there is nothing in the laws of this State which limits the broad authority given by Section 9250, Revised Statutes 1909, to the City of Cape Girardeau, and other cities of the third class, to grant to *any corporation* the right to construct and operate a street railway without its limits; this of course would include the Cape Girardeau-Jackson Interurban Railway Company, which the evidence shows was a corporation. Certain it is that a standard-gauge railroad company, prior to the enactment of the statute in 1899 authorizing the incorporation of street railway companies, was more closely allied to a street railway company than to any other corporation then in existence, or was then authorized to be incorporated, and for that reason, if for none other, it must be presumed that the Legislature when it enacted said Section 9250, authorizing cities of the third class to grant to any corporation the right to construct and operate a street railway upon and over the streets thereof, intended to include standard-gauge railroads; at least, it cannot be reasonably said

that such language excludes the city's authority to grant to such railway company the right to construct and operate a street railway system therein.

But in answer to this argument, counsel for the defendant suggests that there is an irreconcilable conflict between said Section 9250, Revised Statutes 1909, and Sections 9493 and 9494, Revised Statutes 1909, before mentioned, and that since the former is a special law only applicable to cities of the third class, and the latter being a general law applicable to all classes of cities and towns, the former must give way and yield to the latter. If this is true, then the City of Cape Girardeau had no authority to grant to the Cape Girardeau-Jackson Interurban Railway Company a franchise to construct and operate a street railway system in said city, as held in the early part of this opinion. This suggestion, however, in my opinion, is not well grounded. In considering this question, it should be remembered that all three of these sections, 9250, 9493 and 9494, were enacted during the same session of the Legislature; that is, 9493 and 9494 were approved March 26th, 1887 (Laws 1887, page 84, sections 1 and 2), and 9250 was approved March 30th, 1887 (Laws 1887, page 84, section 107), only four days afterwards. We should also bear in mind that Sections 9493 and 9494 are dealing chiefly with elevated and underground street railways, which from common observation, we know would in all probability be constructed only in the first and second class cities of the State; and from the same source we know that many cities of the third class authorize the construction and operation of ordinary surface street railways upon and over the streets thereof.

With the existence of those well known facts, we must presume that the Legislature of 1887 had knowledge of this classification of the cities of the State, as well as the different kinds of transportation required by each, and we must also presume that that classification and those requirements influenced the Legislature

in its passage of the Acts approved March 26 and 30, 1887. These facts throw much light upon the intention of the Legislature when it passed them. Those facts will greatly aid us in our consideration of the question as to whether or not those acts are in conflict with each other.

It must be conceded that, according to its letter, the Act approved March 26, 1887, now Sections 9493 and 9494, Revised Statutes 1909, is general in its provisions, and if standing alone, is sufficiently broad in language to include all classes of incorporated towns and cities of the State, including cities of the third class; also that the Act approved March 30, 1887, now Section 9250, Revised Statutes 1909, is special, and only applies to cities of the third class. But it by no means follows from that concession that the two acts are inconsistent and irreconcilable with each other.

In the case of State ex inf. v. Amick, 247 Mo. 271, the same contention of inconsistency was made as to Sections 3896 and 5828, Revised Statutes 1909, both enacted in 1879. The former related to any vacancy in the office of any circuit judge of the State and the mode or manner of filling the same, and the latter related to any vacancy in any state or county office and the mode or manner of filling the vacancy; it being conceded that the office of a circuit judge is a state office. In passing upon that contention in that case, this court, on page 289, used this language:

"Sections 3896 and 5828 were both enacted in 1879 and have come down unchanged through the various revisions of the statutes.

"If these two statutes are consistent and can stand together then it is the duty of the court to harmonize rather than to hunt for conflict of statutory provisions *in pari materia.*

"In discussing this canon of statutory construction, the Supreme Court of the United States, in the case of Frost v. Wenie, 157 U. S. 58, used this language: 'It is well settled that repeals by implication are not

to be favored. And where two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court—no purpose to repeal being clearly expressed or indicated—is, if possible, to give effect to both. In other words, it must not be supposed that the Legislature intended by a later statute to repeal a prior one on the same subject, unless the last statute is so broad in its terms and so clear and explicit in its words as to show that it was intended to cover the whole subject, and, therefore, to displace the prior statute.'

"And in the case of State ex rel. v. Patterson, 207 Mo. l. c. 144, this court used the following language: 'All consistent statutes relating to the same subject, and hence briefly called statutes *in pari materia*, are treated prospectively and construed together as though they constituted one act. This is true where the acts relating to the same subject were passed at different dates, separated by long or short intervals, at the same session or on the same day. [Sutherland, Statutory Construction, sec. 283.] And 'a statute must be construed with reference to the system of which it forms a part. And statutes on cognate subjects may be referred to, though not strictly *in pari materia*. [Id. sec. 284.]

"In the case of Humphries v. Davis, 100 Ind. l. c. 284, the Supreme Court of Indiana, speaking through ELLIOTT, J., said: 'A statute is not to be construed as if it stood solitary and alone, complete and perfect in itself, and isolated from all other laws. It is not to be expected that a statute which takes its place in a general system of jurisprudence shall be so perfect as to require no support from the rules and statutes of the system of which it becomes a part, or so clear in all its terms as to furnish in itself all the light needed for its construction. It is proper to look at other statutes, to the rules of the common law, to the sources from which the statute was derived, to the general principles of equity, to the object of the statute, and

to the condition of affairs existing when the statute was adopted (citing authorities) . . . 'Construction tion has ever been a potent agency in harmonizing the operation of statutes with equity and justice.' Statutes are to be so construed as to make the law one uniform system, not a collection of divers and disjointed fragments. When this principle of construction is adopted, 'an enactment of today has the benefit of judicial renderings extending back through centuries of past legislation.' [Bishop, Written Laws, sec. 242b.] 'A statute,' says the author just referred to, 'must be construed equally by itself and by the rest of the law. The mind of the interpreter, if narrow, will stumble.' 'The completed doctrine, resulting from a bringing together of its parts, is, that all laws, written and unwritten, of whatever sorts and at whatever different dates established, are to be construed together, contracting, expanding, limiting and extending one another into one system of jurisprudence as nearly harmonious and rounded as it can be made without violating unyielding written or unwritten terms.' [Bishop, Written Laws, secs. 113a, 86.]

"If we observe and give force and effect to the foregoing rules of construction in interpreting Sections 3896 and 5828, then we must read them together—that is, read the one into the other as one enactment. [State ex rel. v. Patterson, supra, l. c. 148.]

"And by so doing Sections 5828 and 3896 would read substantially as follows: Whenever any vacancy shall occur in any state or county office other than the office of Lieutenant-Governor, State Senator, Representative, sheriff or coroner, such vecancy shall be filled by appointment by the Governor; and the person so appointed shall continue in office until the first Monday in January next following the first general election: *Provided*, that if the office of the judge of any court of record in this State shall become vacant, such vacancy shall be filled by appointment of the Governor until the next general election held after such vacancy

occurs, when the same shall be filled by election for the residue of the unexpired term.

"By so reading and construing those two sections together, we eliminate all seeming conflict that exists between them and harmonize all the laws of the State regarding vacancies in state and county offices and the mode of filling same, and at the same time give full force and effect to the plain and clear meaning of the Legislature as expressed in the two sections, which is always the main object to be obtained in construing any statute.

"Laws should be so construed as to give their intent paramount effect. [City of St. Louis v. Lane, 110 Mo. 254.]

"There is another rule of statutory construction, which, if followed in the interpretation of these two sections of the statute, the conclusions reached would be the same as before stated. That rule is stated in the case of Ruschenberg v. Railroad, 161 Mo. 70, in substantially the following language: "Where there are two acts and the provisions of one apply especially to a particular subject, which clearly includes the matter in question, and the other general in its terms, and such that if standing alone it would include the same matter, and thus conflict with each other, then the former act must be taken as constituting an exception to the latter or general act, and not a repeal of the former, and especially is this true when such general and special acts are contemporaneous.

"To the same effect are the following cases: State ex inf. v. Dabbs, 182 Mo. l. c. 366; State ex rel. v. Frazier, 98 Mo. 426; State ex rel. v. Slover, 134 Mo. l. c. 19.

"It is perfectly clear from reading the two sections that the provisions of Section 3896 apply specially to vacancies in the office of judge of courts of record and the manner of filling them, and that those of Section 5828 are general in its provisions and are sufficiently broad, if standing alone, to embrace vacancies in the

office of the judge of courts of record; and if the former is not to be construed to be an exception to the latter, then there would be a clear conflict between them; but since both sections were enacted at the same time and stand *in pari materia,* we must interpret them together, according to the rule before mentioned, and when so done the legislative intent is clear, and we must hold that Section 3896 is an additional exception to those stated in Section 5828."

The statutory rule of construction announced in the case of State ex inf. v. Amick, supra, has been expressly affirmed in the following cases: State ex rel. v. Drainage District, 252 Mo. 345, 1. c. 363; State ex rel. v. Gordon, 261 Mo. 631, 1. c. 648; State ex inf. v. Duncan, 265 Mo. 26, 1. c. 46. Applying the rule just announced to the legislation under consideration, we must hold that Section 9250, being special and only applicable to cities of the third class, is an exception to Sections 9493 and 9494, which are general in their provisions, which if standing alone would include all incorporated cities and towns of all classes, and would be in conflict with each other but by this construction all conflict is avoided, and full force and effect is given to all three of said statutes, which it is the duty of the court to do, in construing statutes, especially those standing *in pari materia.*

We are, therefore, of the opinion that the City of Cape Girardeau had the legal power to grant to the Cape Girardeau-Jackson Interurban Railway Company the authority to construct and operate a street car system within said city; also that said Section 9250 is not in conflict with Sections 9493 and 9494.

II.     Counsel for the defendant next insist that specific performance of the contract should be denied because the evidence fails to show that the plaintiffs delivered to the defendant all of the stock and bonds of said Cape Girardeau-Jackson Interurban Railway Company, together with

Specific Performance.

the franchise required by the contract of purchase involved herein.

Ordinarily, a court of equity will not decree specific performance of a contract, unless the evidence shows that the plaintiff has fully complied with his part thereof, but this is not an inflexible rule. If the evidence discloses the fact that the plaintiff has performed a part of his contract, and that he was ready, able and willing to perform the remainder thereof within the time specified in the contract, but was prevented from so doing by the misconduct of the defendant, or where said misconduct made it useless for the plaintiff to tender compliance within that time [Mitchell's Heirs v. Long, 5 Little (Ky.), 71; Minneapolis & St. Louis Ry. Co. v. Cox, 76 Iowa, 306; 22 Amer. & Eng. Ency. Laws, p. 929 (1 Ed.)]—under such circumstances the court will decree specific performance if it be shown that he is able and willing to perform the balance of the contract at the time of the trial. In other words, if the undertaking of the plaintiff is joint and contemporaneous with that of the defendant, the failure of the former to perform after he has been notified by the words or conduct of the defendant, that further performance would be useless, will not prevent the court from decreeing specific performance in his favor.

In applying the rule just stated to the facts of this case, it is necessary to state that the defendant under the first part of the contract sent or took over all of the physical property of Street Railway Company and has been operating the same ever since January, 1913. And as justly stated by counsel for plaintiffs, the defendant, after the former had agreed to sell to the latter their entire holdings, "induced the Street Railway Company to surrender its franchise to operate an electric light and power plant in the City of Cape Girardeau and to make contracts with the City of Cape Girardeau for lighting; it induced the respondent Railway Company to surrender its rights under its original franchise to operate a telephone system; it induced

the stockholders of the Street Railway Company to surrender and cause to be canceled their certificates of stock in said Railway Company and to issue new certificates thereof to the appellant and it officers; it induced the City of Cape Girardeau to grant apellant's subsidiary corporation a new franchise and contracts for operating and furnishing light and water to the City of Cape Girardeau and its inhabitants; it induced the Public Service Commission of the State of Missouri to approve that franchise and its contracts with the City of Cape Girardeau for water and light, and represented to said Public Service Commission on the same. day that its contract with the respondents ought, in equity, to be regarded as having been fulfilled and performed prior to the creation of the State Board of Public Service.''

No one can read this record and reach any other conclusion than that the plaintiffs, in due time, performed their part of the contract as fully as defendant's conduct would permit and have at all times been and still are willing, ready, and able to perform the remainder of their part of the contract when permitted to so do by the defendant.

Under those facts, a court of equity will compel defendants to specifically carry out its obligations as stated in the contract, as damages are wholly inadequate to measure the loss or fully compensate the plaintiffs for what they have and will suffer if the defendant is not compelled to specifically perform its contract. [Paris v. Haly, 61 Mo. 453; Price v. Morgan, 10 Atl. 663; 22 Amer. & Eng. Ency. Law, (1 Ed.), pp. 957, 961 and 963.]

Moreover, the evidence is uncontradicted that up to the very moment when defendant notified the plaintiffs that it would not complete the performance of its part of the contract, because of the controversy which arose over the charter powers of the Cape Girardeau-Jackson Interurban Railway Company, and the franchise of the Cape Girardeau Street Railway Company, the plaintiffs were ready, willing and able to complete

the performance of its part thereof, and unquestionably would have done so had it not been for the misconduct of the defendant before mentioned. The plaintiff having thus parted with the control of all of the physical property mentioned in the contract and surrendered all of their franchises connected therewith, and the defendant having acquired the former, and with the assistance of the plaintiffs induced the City of Cape Girardeau to grant it in lieu thereof new franchises similar in all respects to those surrendered, all on the faith of said contract, valued at several hundred thousands of dollars, which, by the way, can never be restored to plaintiffs, to now deny specific performance of that contract would be unconscionable and a travesty upon equity and justice.

We are, therefore, of the opinion that the trial court, on the merits of the case, properly overruled both of the defendants demurrers to the evidence, and in this connection it may not be out of place to state that a demurrer to the evidence has no standing in an equity case.

There are a score or more propositions presented and discussed by counsel for the defendant in their briefs, but after giving them due consideration, we are of the opinion that there is no merit in any of them.

For the reasons stated, the judgment of the circuit court is affirmed. All concur.